882 A.2d 993 (2005)
380 N.J. Super. 495
PRINCETON INSURANCE COMPANY, Plaintiff-Appellant,
v.
Shams QURESHI, M.D., Spine Orthopedic and Sports Rehabilitation Center and Pain Center of North Jersey a/k/a Pain Center of N.J. and their Assignee Sherrance Henderson, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2005.
Decided October 6, 2005.
Thomas M. Walsh, Marlton, argued the cause for appellant (Parker, McCay & Criscuolo, attorneys; Mr. Walsh, on the brief, Stacy L. Moore, Jr., of counsel).
Scott A. Parsons, Old Bridge, argued the cause for respondents (Parsons, Powell & Lane, attorneys; Mr. Parsons, on the brief).
Before Judges SKILLMAN, AXELRAD and PAYNE.
The opinion of the court was delivered by
*994 PAYNE, J.A.D.
Princeton Insurance Company appeals from an order of summary judgment against it, holding it liable for the entire amount of a judgment of $5,400,000, plus pre- and post-judgment interest, entered on a jury verdict in a medical malpractice action in favor of Sherrance Henderson and against Princeton's insureds Shams Qureshi, M.D. and his two wholly-owned professional corporations, Spine Orthopedic & Sports Rehabilitation Center and Pain Center of North Jersey a/k/a Pain Center of NJ, jointly, severally and in the alternative. The summary judgment was based upon a finding by the motion judge, Stephen Bernstein, that Princeton had exercised bad faith in refusing to accept Henderson's offer to settle her claims against the Pain Center for the one million dollar policy limit of Princeton's coverage of that entity. We affirm, premising our conclusion on Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 323 A.2d 495 (1974).

I.
In 2001, Henderson filed suit against Qureshi, Spine Orthopedic and the Pain Center, as well as others, seeking damages for injuries sustained when Qureshi mistakenly injected a prolotherapy solution containing phenol (a caustic substance), dextrose and lidocane into her spinal cord. As the result, Henderson's legs became paralyzed, and she experienced significant bowel, bladder and sexual dysfunction. Although Henderson eventually regained the ability to walk, she does so with a pronounced limp resulting from a drop foot, and only with the aid of a leg brace and a cane. Her remaining injuries are permanent. Henderson continues to experience significant pain as the result of the injuries. At the time of the occurrence, Henderson, who was in her early thirties, was employed as Regional Director of Pharmaceutical Affairs by Roxanne Laboratories, Inc., and she was pursuing a masters degree in business administration at Johns Hopkins University. Formerly, she was a beauty queen and athlete. Now, she has been determined by the federal government to be totally disabled, and she has been deemed unemployable. Her economic expert estimated the present value of her economic loss to be $2,698,204 with an additional $1,513,063 in future medical expenses.
At the time of Henderson's injury, Qureshi, Spine Orthopedic and the Pain Center were insured under a single policy of insurance issued by Princeton to Spine Orthopedic that provided coverage of one million dollars each to Qureshi and his two professional corporations. Following service of Henderson's complaint, in letters dated April 6, 2001 and February 9, 2002, Princeton offered a defense to each of its insureds, without any reservation of rights. The firm of Francis & O'Farrell was assigned to represent them. John O'Farrell conducted that defense on behalf of the three insureds throughout the underlying litigation.
As discovery progressed, it became apparent to O'Farrell that Henderson's claim against Qureshi was not defensible. In an undated quarterly report submitted by O'Farrell to Princeton after exhaustive discovery had been completed, O'Farrell expressed the view that Qureshi's viability as a witness was poor and that the impact of his testimony would be unfavorable, whereas he evaluated the testimony of all of Henderson's multiple lay and expert witnesses as favorable to her and unfavorable to the doctor. Even the expert retained on Qureshi's behalf could not unequivocally support the defense position. O'Farrell estimated the chances that Qureshi would prevail at trial at ten percent, *995 and gave an anticipated verdict range of $7,000,000 to $10,000,000. He stated: "This is a case in which a jury can easily become inflamed against Dr. Qureshi and effectively award punitive damages against him in the form of an inflated compensatory verdict that will be difficult to overturn on appeal." Settlement was urged.
Relatively early in the litigation, Henderson's counsel had taken the position that a "physicians exclusion" rendered coverage to Spine Orthopedic unavailable for purposes of settlement, but that coverage in the amount of one million dollars each existed for Qureshi and the Pain Center. Although Princeton did not reserve its rights against Spine Orthopedic, it in large measure adopted the coverage analysis proposed by Henderson's attorney.
By letters dated February 10, 2003, one day before the scheduled commencement of trial, Kathleen Gill, a Princeton claims consultant, advised Dr. Qureshi and the Pain Center that it "would be in your best interest if Princeton Insurance Company could attempt to settle this case," and she urged each to discuss that possibility with personal counsel. The letters continued:
Your policy limits under PS 9229 09 01 are $1M/$3M. The settlement demand is currently $15M. If there is a verdict in excess of your policy limits you will be responsible for such an excess verdict.
In a letter dated March 3, 2003 to Princeton's coverage counsel, with copies to defendants' personal attorney Ethan Sheffet and O'Farrell, Henderson's counsel demanded the Pain Center's one-million-dollar policy limit. He then stated:
In the event the policy limit is not tendered, and an excess verdict as to the Pain Center of North Jersey is obtained at trial, this office will seek a bad faith claim against Princeton Insurance Company in accord with Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 65 N.J. 474[, 323 A.2d 495 (1974)] and its progeny. We are herewith placing Princeton Insurance Company on notice that plaintiff, Sherrance Henderson, is demanding the $1,000,000 policy limits of the Pain Center of North Jersey. We are not, however, demanding Dr. Qureshi's $1,000,000 personal professional liability policy limit.
Defendants' personal counsel Sheffet responded to Princeton's coverage counsel on behalf of the Pain Center and Spine Orthopedic, respectively, in letters dated March 11 and 14, 2003. He acknowledged that Qureshi had already consented to settlement, stated that the corporations did so as well and requested that the one million dollars in coverage afforded to each corporation be offered in addition to Dr. Qureshi's coverage "so as to achieve a resolution of the matter."
In the meantime, on March 8, 2003, the trial judge, Jared Honigfeld, had ruled on the basis of admissions by Qureshi in deposition testimony that both the Pain Center and Spine Orthopedic would be held vicariously liable for any judgment against Qureshi. The doctor, claims consultant Gill and Vice-President of Claims Peter Leone were informed of this ruling by O'Farrell.
As the documents forming the record on summary judgment reflect, settlement remained under active consideration by Princeton as the trial progressed. Gill drafted two e-mails to Leone and one memo to the file on March 17. In the first e-mail, Gill reported that summations would conclude that afternoon, and the jury would be charged the next day. She then stated (utilizing commonly employed un-capitalized form):
as of 1:30 pm [Henderson's counsel] reveals that his client may accept [a co-defendant's] 1 million policy and she *996 may accept the pain center policy of 1 million as well. however, she will not accept dr qureshie's [sic] 1 million policy that we have previously tendered. obviously, b[y] offering the pain center's 1 million policy we protect ourself from bad faith issues.
Gill then stated that 1.5 million was already "on the table" and asked for Leone's advice. Leone, in turn, forwarded Gill's e-mail to Princeton's Chief Operating Officer, Charles LeFevre, noting that the judge had rendered his opinion on the Pain Center policy and that he "feels it does apply." Leone recommended offering one million dollars on behalf of the Pain Center.
In a second e-mail to Leone, written one-half hour later, Gill reported that O'Farrell believed that the verdict would be between three and five million dollars. She stated:
he knows that the jury absolutely hates qureshie due to his blatant lying on cross examination. he knows that judge honigfeld has already opined that henderson can access both PA policies.
Gill stated that she would ask O'Farrell for a settlement recommendation, which she recorded in her 5:00 p.m. memo as being an offer of one million each for the Pain Center and Qureshi. Gill then stated in the memo that O'Farrell was "concerned that [defendant's] assets are in his PA."
A memo written by Gill on the following day indicated that O'Farrell had informed her that Henderson would not take two million dollars either for Qureshi alone or for all Princeton insureds. At 1:45 p.m., the memo indicates, she authorized O'Farrell to offer one million dollars on behalf of Qureshi, linked to a one-million dollar offer on behalf of both corporations. She indicated that the offer "forces them to get [defendant] out of harms way. protects PA  avoids bad faith issues."
The linked two-million-dollar offer was conveyed to Henderson, who rejected it on the record, despite her counsel's recommendation that it be accepted. During the colloquy regarding the offer, the following exchange occurred:
[PLAINTIFF'S COUNSEL] Just for clarification, Mr. O'Farrell, my understanding is that the  as you know, we've demanded the million dollars from the Pain Center. The two-million dollar offer is conditional, in the sense that we would be unable to accept the one-million for the Pain Center only. Is that correct?
MR. O'FARRELL: That is correct.
A jury verdict against Qureshi, and by operation of the court's order, against the Pain Center and Spine Orthopedic was rendered soon thereafter and reduced to judgment on May 9, 2003. No appeal from that judgment was filed. On the same day, an order was entered releasing defendants from liability to Henderson and assigning their claims against Princeton to her.
Princeton tendered payment of one million dollars to Henderson on behalf of Qureshi and filed the present declaratory judgment on May 6, 2003 to establish the absence of applicable coverage for the Pain Center and Spine Orthopedic. In a counterclaim filed by Henderson, she alleged that Princeton had acted in bad faith in failing to settle the underlying action within policy limits.
Cross-motions for summary judgment were filed in early 2004 that addressed both issues of coverage and Henderson's bad faith claim. Following oral argument and receipt of post-argument submissions, Judge Bernstein rendered a decision in which he stated:
The Court finds that Princeton Insurance Company knew that the plaintiff in *997 the underlying action would accept the $1 million limit to settle the case. As to the defendant [the Pain Center[1]], Judge Honigfeld had ruled that ... both the corporate entities were vicariously liable.
And Princeton knew that the value of the case, an unfavorable liability, left this particular insured exposed to a potential excess liability situation that could have been settled within the policy limits. This is exactly the situation that Rova Farms v. Investors Insurance Company at 65 New Jersey 474[, 323 A.2d 495] addresses.
Princeton chose in this case to assign one counsel to represent all three entities, knowing that there existed a conflict or potential for conflict when dealing with competing demands for three entities for the limited available coverage that was clearly not sufficient to settle the entire case and protect all of the insureds, but could have at least prevented the named corporate defendant from an excess verdict.
What is not addressed in either of the moving papers is the fact that Princeton has a duty to each of its insureds. And if separately represented, they would have been in a position to recommend a course of action that could potentially have protected at least that insured to the extent possible.
The Court finds at least as to the claim of the main corporate defendant [Pain Center] that Princeton is responsible to the full extent of the verdict. As a result, the coverage issue [as to Spine Orthopedics] is moot and the Court finds that they did act in bad faith in at least not resolving the case as to the corporate defendant that could have been settled out of the case.
Summary judgment was therefore granted in Henderson's favor.

II.
We find the reasoning of Judge Bernstein to have been substantially correct. Our decisions have long held that an insurance company owes to its insured a duty of good faith that applies when, as here, the insurer reserves control of settlement negotiations. See Bowers v. Camden Fire Ins. Assoc., 51 N.J. 62, 71, 237 A.2d 857 (1968). In such circumstances,
a decision not to settle must result from weighing, in a fair manner, the probabilities of a favorable or adverse verdict in the trial of a covered damages suit against the insured.... [T]he purpose of [liability] insurance is to protect the insured from liability within the limits of the contract. The courts ... cannot allow the insurer to frustrate that purpose by a selfish decision as to settlement which exposes the insured to, and which results in, a judgment beyond the specific monetary protection which his premium purchased.
[Ibid.]
See also Rova Farms, supra, 65 N.J. at 492-93, 323 A.2d 495. When an adverse verdict is likely to exceed the policy limit, "the boundaries of good faith become more compressed in favor of the insured, and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might be liable for any verdict which might be recovered." Id. at 493, 323 A.2d 495.
Princeton does not dispute these principles as they apply in instances in *998 which the assets of a single insured may be at risk. However, it argues that the principle of fidelity applicable to one insured gives way in a circumstance such as this where individual limits are applicable to multiple insureds under a single policy. In such circumstances, Princeton argues that a balancing of the interests of the insureds must occur, and it implies that when the assets of an individual and his two wholly-owned corporations are at stake, the interests of the corporations may be subordinated to that of the individual insured. However, Princeton supports its argument with inapplicable cases concerning situations in which a single policy limit is applicable to multiple insureds, and settlement of claims against one depletes coverage available to the remainder. See Lehto v. Allstate Ins. Co., 31 Cal.App. 4th 60, 36 Cal.Rptr.2d 814 (1994), review denied, 1995 Cal. Lexis 1981, cert. denied, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); Strauss v. Farmers Ins. Exchange, 26 Cal.App. 4th 1017, 31 Cal.Rptr.2d 811 (1994), review denied, 1994 Cal. Lexis 5175 (1994). Here, a one-million-dollar policy limit was applicable to each insured. Princeton's arguments thus lack legal support.
In decisions upon which Henderson relies, we have held that when the interests of multiple insureds differ on issues of liability, separate counsel must be appointed to protect and advance those interests. See Wolpaw v. Gen. Acc. Ins. Co., 272 N.J.Super. 41, 45, 639 A.2d 338 (App. Div.) ("A liability insurer that insures codefendants whose interests conflict with one another must retain separate and independent counsel for each insured or permit each insured to do so at the insurer's expense"), certif. denied, 137 N.J. 316, 645 A.2d 143 (1994); Yeomans v. Allstate Ins. Co., 130 N.J.Super. 48, 54, 324 A.2d 906 (App.Div.1974); cf. New Jersey Mfrs. Ins. Co. v. Haran, 128 N.J.Super. 265, 270, 319 A.2d 768 (App.Div.1974).
The present case is unusual, in that the interests of Qureshi and his corporations were allied on the issue of liability, each seeking its minimization in exactly the same manner as the result of the operation of principles of vicarious responsibility. However, because of the nature of Henderson's settlement demand, their interests in settlement may have differed, although we do not perceive a basis upon which Qureshi could have objected to the protection of the Pain Center's assets through a settlement of claims against it, even if his own liability could not be concurrently compromised. As O'Farrell recognized and expressed in his March 17 call to Gill, Qureshi's own assets were lodged in the Pain Center, and he had every reason to desire their preservation. Further, Qureshi would have been entitled to a pro tanto reduction in the amount of the judgment against him and Spine Orthopedic as the result of any settlement with Spine Center. De Los Santos v. Saddlehill, Inc., 211 N.J.Super. 253, 263-64, 511 A.2d 721 (App.Div.1986), certif. denied, 107 N.J. 101, 526 A.2d 175 (1987).[2] Thus, the sum available to him for payment of a judgment was not depleted.[3]
*999 In any event, it is clear that during the course of settlement negotiations Princeton did not regard itself as having an obligation to settle claims against the Pain Center independent from its obligation to protect Qureshi, nor did it seriously consider whether such a settlement would have benefited Qureshi. As a consequence, Princeton exposed the assets of the Pain Center to attachment in satisfaction of an excess judgment when those assets could have been protected through a settlement within policy limits. As our recitation of the history of settlement negotiations in this matter has disclosed, Princeton was aware at least from the time of Judge Honigfeld's March 8 ruling that the Pain Center would be vicariously liable for the torts of Qureshi; it was aware that Qureshi had a minimal chance of prevailing at trial; and it was aware that a verdict in excess of available coverage was likely. Nonetheless, despite a demand for the Pain Center's policy limit, Princeton never offered any amount of money on behalf of that entity that was not tied to settlement of claims against Qureshi. Further, Princeton never offered the face amount of the Pain Center's coverage on its behalf, but instead offered five hundred thousand dollars each on behalf of the Pain Center and Spine Orthopedic. This fact is conceded by Princeton in its brief on appeal, in which it consistently refers to the one million dollars from the Pain Center and Spine Orthopedic policies as "the equivalent of" the limit of the Pain Center policy.
At oral argument on appeal, counsel for Princeton sought to suggest that defendants' personal counsel Sheffet had in his authorization letters required an all-or-nothing settlement. We do not read Sheffet's correspondence in that fashion. None of the Princeton documents contained in the record reflect its awareness of such a limitation. Moreover, the record contains no indication that either Sheffet or Qureshi was consulted by Princeton regarding Henderson's offer of a separate settlement of claims against the Pain Center.
It is thus manifest that Princeton acted in bad faith in connection with Henderson's settlement demand to the Pain Center. We perceive no factual issues requiring remand for a further exploration of the reasonableness Princeton's conduct in the circumstances of this case.
We note that Princeton does not assert here, as it did in its complaint for declaratory judgment, that coverage for the torts of Qureshi was excluded by the terms of its policy as it applied to the Pain Center. We agree with Judge Bernstein that in this circumstance, whether coverage was likewise available to Spine Orthopedic is irrelevant, since it is Princeton's conduct in connection with the settlement of claims against the Pain Center that is at issue.
Summary judgment is affirmed.
NOTES
[1] Throughout his opinion, Judge Bernstein mistakenly referred to Spine Orthopedic and Sports Rehabilitation Center. We have corrected that mistake, finding no material dispute to exist as to the correct corporate defendant.
[2] Contrary to Princeton's position, we find no support in N.J.S.A. 14A:17-8 for the proposition that Qureshi's stock in Pain Center could have been seized in satisfaction of judgment if a settlement with Pain Center had been reached, since such a process would have exposed Pain Center's assets to liability for the debts of Qureshi in a manner prohibited by that statute.
[3] We reject Princeton's argument that settlement was not warranted when it would have provided a war chest for use by Henderson's attorney in conducting the litigation. That consideration is irrelevant. Moreover, the litigation was virtually at its end when the settlement negotiations at issue occurred.